UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| CLIFFORD VON TOMB, ) | |
| ) | |
| Debtor. ) | Case No. 10 B 32131 |
| ) | |
| ) | |
| MARY G. EVANS, ) | |
| ) | Adv. No. 10 A 2364 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Pamela S. Hollis |
| CLIFFORD VON TOMB, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint. Plaintiff Mary G. Evans seeks a finding that the debt arising from the acts that formed the basis of the judgment entered in her favor in state court against Debtor/Defendant Clifford Von Tomb, on counts involving defamation, battery, assault and intentional infliction of emotional distress, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). The court heard the testimony of two witnesses, Evans and Amy Sayre, and reviewed the exhibits admitted into evidence. For the reasons stated below, judgment will be entered for Evans.

**FINDINGS OF FACT**

Evans met Tomb in Florida in 2003, and they began dating. At Tomb's request, Evans moved to Chicago in June 2004. They spent a short time together in two residences before moving in October 2004 to a one bedroom apartment at 1350 North Clark Street (Sandburg

Terrace) that Tomb had purchased. Evans brought only her cat, clothing, shoes and stereo. Everything else belonged to Tomb.

In August 2004, Evans started working as a manager at BeBe, a women's clothing store in Oak Brook, Illinois. Tomb was not working at the time, although he eventually joined the National Guard, serving one weekend each month.

On the weekend of November 6-7, 2004, Tomb had his National Guard obligation and was out of town. Evans went out that Saturday night with her friend Ashlee Abrizzo.[1] When Evans returned to the apartment around 2:00 a.m. she discovered that there had been a fire. The apartment was pitch black, with firemen and water everywhere. Everything in the apartment was consumed in the fire, and Evans' cat died. The fire marshal spoke with Evans and told her that the Chicago Fire Department would be conducting an inspection. At the time, Evans had no idea how the fire began, although she eventually learned that it started from a "'pinched' power cord supplying an energized lamp igniting paper products and clothing." **Pl. Ex. 3**.

Evans spoke to Tomb on the telephone before he returned from National Guard duty, and he was just happy that she was alive. Evans went to live in an extended stay hotel near her job in Oak Brook. She continued speaking with Tomb throughout November, but his demeanor fluctuated. Sometimes he acted in a loving manner, and sometimes he blamed her for the fire.

Evans spent the night of November 28-29, 2004, at Tomb's mother's residence on Astor Place in Chicago. Tomb had just learned that he did not have the insurance coverage he had thought was in place. He blamed Evans for the fire, accusing her of leaving an iron on.

At 7:30 a.m. on November 29, Tomb refused to give Evans her car keys. Then he dragged her to the front door and threw her around to the wall. Her back and head hit the wall. No one else was home at the time.

---

[1] Abrizzo did not testify. Evans testified that Abrizzo was afraid to appear in court.

Evans asked Tomb to stop, but he continued both the physical violence as well as verbal abuse, calling her names while accusing her of burning down the apartment. Tomb threw Evans down to the ground, grabbed and ripped her shirt, and climbed on top of her. He began screaming at her, raising her head and pushing it back down two or three times. Eventually Tomb got up and Evans ran to the door.

Tomb came out of the apartment and followed Evans into the hallway. She ran to the interior stairwell. Tomb followed Evans and pushed her down the stairs. She landed on her back, then got up and ran out of the building.

After leaving the building, Evans called Tomb's friend Omar and asked him to help her. She did not call 911 at the time. She was shaken up and concerned with getting to work and with obtaining her key.

On December 12, 2004, Evans went to the Chicago Police Department and made a report of these events. **Pl. Ex. 5**. She waited two weeks before going to the police because during that time she remained in contact with Tomb, and their conversations veered between loving and hateful. When she was finally fearful, she made a police report. The police did not take pictures of her, and Evans does not have any photographs of ripped clothing or bruises from the November 29 attack.

After November 29, Evans' and Tomb's phone conversations got out of control. Sometimes Tomb loved Evans, other times he hated her. A police officer advised Evans to obtain an order of protection, although she did not do so at that time.

Evans moved into her own apartment at 1100 North Dearborn Street in Chicago. The fire had destroyed all of her possessions, so the apartment was furnished with an egg crate, a mattress given to her by the manager of her store, and a television she purchased from a friend for $75.00.

Although she was not originally from Chicago and this apartment was just a few blocks from the one she had shared with Tomb, Evans liked living in that area, had a good job and wanted to stay in Chicago.

On January 1, 2005, Tomb unexpectedly showed up at Evans' apartment. She opened the door and Tomb entered. He made accusations about what she had done the night before (New Year's Eve) with one of his friends. He screamed at her and used derogatory language.

Tomb then threw Evans down on the floor, picked up her television and threw it at her. The television shattered, leaving glass scattered all over the floor. Years later, Evans was still stepping on glass. Seconds after throwing the television, Tomb left the apartment. Photographs of the apartment after this fight were admitted into evidence as **Pl. Exs. 13-A and 13-B**.

Evans went to work the next day. Tomb called her store repeatedly, describing Evans in derogatory terms and stating that she burned his house down. Evans' co-manager stated that this was disrupting work at the store, and the police were called.

Evans made a report to the Oak Brook police. **Pl. Ex. 11**. She played messages for the police that Tomb had left on her cell phone, in which he used derogatory language and accused Evans of destroying his life.

The next day, January 3, 2005, Evans learned that Tomb sent a letter to all four BeBe clothing stores in the Chicagoland area, as well as to Evans' regional manager and her parents. **Pl. Ex. 4**. The letter contained extremely derogatory accusations about Evans and her behavior. After learning about the letter and its contents, Evans was fearful. She realized that her relationship with Tomb had gotten out of control. Evans told Tomb in an email on January 3, 2005, that he won and that he had destroyed her life. **Pl. Ex. 12**.

However, Evans knew that Tomb was leaving for boot camp on January 4, 2005. She hoped that all of this would just go away when Tomb left. So despite her co-manager's suggestion that she take legal action, Evans did nothing further at that time.

While Tomb was at boot camp, he and Evans communicated. Evans still cared for him and had a hard time letting go, in light of the fact that she had moved to Chicago for him. She even flew to his boot camp graduation in March 2005.

After a few months, Evans changed jobs and began working at BCBG, a women's clothing store in downtown Chicago. When Tomb came back from boot camp, they communicated and Evans thought things might have changed. She decided to get back together with him. Then Evans learned that he had been dating another girl during December 2004 and throughout boot camp. When Evans told Tomb she would only have an exclusive relationship with him, the frightening behavior returned.

On June 1, 2005, Evans made another police report about Tomb's behavior toward her. **Pl. Ex. 6**. He made threatening statements, which the reporting officer recorded as "I'll destroy you the first chance I get; you better watch your back!" Evans testified that she "just wanted it to stop. I just wanted peace." She sought and obtained an emergency order of protection from the Circuit Court of Cook County. The order was in effect from June 30 to July 21, 2005. **Pl. Ex. 7**.

Tomb continued to leave occasional voicemail messages for Evans. Sometimes she ran into him and, depending on the day, it could go well or it could go poorly. She testified that "Chicago was his city; he would do whatever it took to get rid of me."

In August and September 2005, Evans was working at BCBG with assistant manager Merriah Guccione.[2] Throughout the time Guccione and Evans worked together, Guccione knew about the situation with Tomb. In September 2005, Tomb approached Guccione and Evans near

---

[2] Guccione did not testify at trial, but an affidavit from her was admitted into evidence as part of **Pl. Ex. 20**.

State Street and Division Street in Chicago and grabbed Evans' phone. He began yelling at them, and Guccione and Evans ran away.

Evans and Tomb continued to communicate throughout the fall of 2005, and she told him that she planned to leave Chicago. But she obtained a new job in Chicago, and when she ran into Tomb on November 22, 2005, Evans was so excited about the new position that she told Tomb about it.

The next day, Evans received a phone call from Tomb in the early morning hours, in which he stated that he would do whatever it took to get rid of her. Evans realized that she could not risk Tomb ruining another job for her, and she did not feel safe. Evans hired an attorney and obtained an order of protection from the Circuit Court of Cook County on December 14, 2005. The order was in effect for two years. **Pl. Ex. 9.**

In 2006, Tomb sued Evans in the Circuit Court of Cook County, alleging that he spent $44,000 on repairs to the apartment because of the fire. **Pl. Ex. 20.** After several amended complaints, Evans filed counterclaims. She learned that the $44,000 figure was only an estimate, and did not represent an actual outlay of funds.

On November 19, 2007, Judge Laurence J. Dunford entered judgment in Evans' favor and against Tomb, as follows:

| Counts I-II | Defamation | $ 4,000.00 |
| Counts III-IV | Defamation | $ 18,000.00 |
| Count V | Battery | $ 25,000.00 |
| Count VI | Assault | $ 1,000.00 |
| Count VII | Property damage | $ 50.00 |
| Count VIII | Intentional infliction of emotional distress | $ 50,000.00 |
| Count IX | Negligence | $ 25,000.00 |

    Punitive damages as to all counts                  $350,000.00
    except Count IX

**Pl. Ex. 20**. In the instant complaint, Evans seeks a finding that all amounts awarded by the state court are nondischargeable except the $50 property damage award and the $25,000 negligence award.

Evans' friend Amy Sayre also appeared as a witness. She stated that Evans locks her door every night, afraid that Tomb will appear. Evans has told Sayre many times that she fears that one day she will disappear and no one will know what happened to her. Sayre also testified that Tomb told Evans more than once that he is smart enough to kill her and get away with it. Sayre has never met Tomb.

Tomb did not call any witnesses and did not testify as a witness.

## CONCLUSIONS OF LAW

Evans seeks a finding of nondischargeability pursuant to 11 U.S.C. § 523(a)(6):

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

    (6)    for willful and malicious injury by the debtor to another entity or to the property of another entity.

Evans must prove her case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991). Exceptions to discharge are narrowly construed in favor of the debtor. In re Chambers, 348 F. 3rd 650, 654 (7th Cir. 2003) (citations omitted). In order to prevail on her complaint, Evans must prove by a preponderance of the evidence that: (1) Tomb caused an injury; (2) his actions were willful; and (3) his actions were malicious. See In re Cole, 378 B.R. 215, 226 (Bankr. N.D. Ill. 2007).

The Supreme Court has clarified the meaning of § 523(a)(6), stating that "only acts done with the actual intent to cause injury" come within its scope. Kawaauhau v. Geiger, 523 U.S. 57,

61 (1998). This subsection was intended to prevent debtors from discharging debts based on intentional torts. Kawaauhau, 523 U.S. at 61-62. The court notes that Evans is not seeking a finding of dischargeability as to the portion of her judgment attributable to property damage and negligence.

The injury must be intentional, "not merely a deliberate or intentional act that leads to injury." Id. at 61 (emphasis in original). As for acting with malice, the Seventh Circuit instructs us that actions are malicious when made "in conscious disregard of one's duties or without just cause or excuse." Matter of Thirtyacre, 36 F. 3rd 697, 700 (7th Cir. 1994) (citations omitted). Some courts have called this definition into doubt, see In re Jorenby, 393 B.R. 663, 666-67 n.2 (Bankr. N.D. Wis. 2008), but "[i]t can at least be said . . . that the key to maliciousness under § 523(a)(6) is consciousness of wrongdoing." In re Vaccaro, 2010 WL 4053914, *8 (Bankr. N.D. Ill. Oct. 14, 2010) (quotation omitted).

The court heard testimony at length from Evans regarding Tomb's violent and threatening behavior toward her on several occasions. Tomb threw her down on the ground, smashed her television, yelled at her using derogatory language and wrote letters to co-workers and family in which he made embarrassing allegations. Evans made two police reports and obtained two orders of protection. Her friend Amy Sayre testified to Evans' fearful state of mind.

The court found both Evans and Sayre's testimony credible. It was chilling to hear Sayre's testimony that Evans fears she will disappear one day and no one will know what happened to her. Not only was the testimony submitted by the Plaintiff credible, and supported by the police reports and orders of protection, but Tomb made absolutely no attempt to rebut or deny any of it.

Evans' injury is represented by the amount of damages set by the state court in Judge Dunford's November 19, 2007 order. Tomb hit, threatened and terrified Evans over a long period of time. When he threw her down to the ground in his mother's apartment, and again in Evans' apartment, he clearly intended to cause injury to Evans. The same is true for the hateful letters sent to colleagues and family; Tomb acted with the intent to cause injury to Evans. The actions that gave rise to Evans' judgment were willful, excepting the amount attributable to property damage and negligence.

Moreover, there is no question that Tomb's actions were malicious. The Seventh Circuit tells us that actions are malicious when made "in conscious disregard of one's duties or without just cause or excuse." There is no just cause or excuse for the torts Tomb committed against Evans.

When he cross-examined Evans, Tomb made several comments which the court construes as attempts to argue that his actions were excused. For example, he asked Evans whether she paid rent when they lived together. Even if a failure to pay rent was somehow an excuse for assault – which it most certainly is not – it has no relevance to Tomb's actions after Evans moved out of the apartment.

Tomb also questioned why Evans waited until December 12, 2004, to make a police report of the events of November 29, 2004. Evans explained that her relationship with Tomb was not linear. They continued to communicate even while he was threatening her.

Throughout her testimony, Evans's demeanor was consistent. She did not proffer excuses for remaining in contact with Tomb even while he sometimes threatened her; she simply explained that she had strong feelings for him. A court may recognize that personal relationships

are not always logical, and the fact that Evans continued to speak with Tomb, some times more than others, does not provide any excuse for Tomb to assault or threaten her.

Additionally, Tomb accused Evans of violating the orders of protection she obtained by remaining in contact with him. The orders of protection, however, prohibited only Tomb from contacting Evans. Evans' behavior was not proscribed in any manner by the orders of protection. Was it a good idea for Evans to continue communicating with a person who frightened her so much that she filed police reports and obtained orders of protection? No, clearly not. But the court does not accept Tomb's inference that Evans' soft-heartedness excused his behavior.

Finally, Tomb argued that Evans' failure to produce any telephone records undercut her testimony that he made threatening phone calls. Apparently Tomb requested the phone records during discovery, although he never brought a motion to compel production when the records were not produced, and he never issued a subpoena to Evans' phone company.

The lack of phone records has no bearing whatsoever on the court's decision. Evans was very forthright about the fact that she and Tomb continued to speak on the telephone, and that many of these calls were pleasant. Records from a phone company cannot tell us whether the nature of the conversations was loving or cruel; the phone company does not record the conversations. The only basis for finding that Tomb made verbal attacks on Evans over the phone is Evans' testimony, which the court finds to be very credible. Tomb did not deny that the parties spoke, or that he made hateful and derogatory comments to Evans, so there is no rebuttal to Evans' testimony. The lack of phone records is a straw man.

The court heard extensive testimony from Evans regarding Tomb's attacks on her, both physical and verbal. These are the actions that gave rise to the state court judgment, which represents Evans' injury. The court finds that those actions were both willful and malicious.

## CONCLUSION

For the reasons stated above, Evans' claim against Tomb is nondischargeable under 11 U.S.C. § 523(a)(6). A judgment order in accordance with this opinion will be entered.

Date: 07 FEB 2012

_____
PAMELA S. HOLLIS
United States Bankruptcy Judge